# Long et al. v. Freeman et al.

*William A. O'Connor* and *J. Q. Creveling*, for plaintiffs.

*James R. Scouton*, for defendants.

VALENTINE, J., September 14, 1932.—On August 6, 1928, plaintiffs filed a bill in equity against the defendants praying for an injunction restraining the defendants from closing the natural channel and outlet of a stream in Plymouth Township, alleged to flow down a mill race and through an old waterway of an abandoned mill and thence into Harvey's Creek.

A preliminary injunction was granted and later continued until final hearing.

On September 6, 1928, defendants filed their answer, and on October 14, 1929, filed an amended answer.

The issues raised are whether the natural course of the surface water was south through the mill race and thence through the wheel pit of said mill into Harvey's Creek and whether the defendants obstructed or interfered with the same.

## Findings of fact

1. The plaintiffs are the owners of adjoining lots in the village of West Nanticoke, Plymouth Township, Luzerne County, which lots are improved with dwelling houses.

2. An old mill race is located along the southwesterly boundary line of plaintiffs' property. This race was formerly used in conjunction with the waterwheel mill operated on the lot adjoining the southwesterly boundary line of the lot of Hiram W. Long and wife, plaintiffs.

3. Said race runs along the southwesterly boundary line of plaintiffs' property in a southeasterly direction. After the race was built the water from it ran in its natural course into a forebay, from which it was conducted into the old mill. The walls of the mill were standing at the time suit was brought and formed, in the interior, a pit for the water from the mill race.

4. From the pit within said walls, the water passed through a large conduit or artificially constructed sluiceway under the wall, and underground to and across the public road leading from Harvey's Creek to Lake Silkworth, and after passing under said public road flowed into Harvey's Creek.

5. The mill was destroyed by fire in 1910 and not rebuilt. Prior to its destruction, it had been operated for approximately 50 years.

6. The general course of the water in the mill race was and is from north to south.

7. On the westerly side of the race there is a mountainside in which the water from rains and springs has formed a gully. The water from this gully entered the mill race and flowed through the same in the course from north to south.

above designated. This has continued since the construction of the mill race down to the time of the filing of the bill, or a period of approximately 75 years.

8. The principal gully or channel in the mountainside entered the mill race at a point on the westerly side of the premises of Hiram W. Long and wife, plaintiffs. This was a natural channel leading into the mill race and from the time of the construction of the race, the water from the channel passed into it and down into the forebay and into the pit and sluiceway and thence into the creek.

9. The defendants, Elmer Freeman and Beulah Freeman, his wife, own the land on the westerly side of the mill race along the mountainside in the rear of plaintiff's property. They do not own the land traversed by the gully. They own the old mill, wheel pit, forebay, and the lot on which the mill wheel stands, having purchased the same in 1927.

10. In July 1928 a rain storm of unusual severity occurred, causing the water from the gully to overflow and carry into the pit of the mill race, along the property of the plaintiffs, a large quantity of gravel, stone, and other debris which partially obstructed the race and retarded the flow of water through the same and caused the water to overflow plaintiffs' properties. Defendants refused to remove this obstruction from the race and refused to permit the plaintiffs to remove the same. When plaintiffs undertook to remove the same defendants threatened them and opposed the removal of the obstruction.

11. In August 1928 a second rain storm occurred which because of the then existing obstruction in the mill race again caused the premises of the plaintiffs to be flooded.

12. The mill race forms and has formed for a period of at least 50 years the natural drainage for the water from the gully or channel from the mountainside.

13. The long-continued use of the mill race as the course of natural drainage has made it the necessary and natural course for the water accumulating on the mountainside. There is no other course by which the water has been drained from the gully since the mill was constructed.

14. The defendants undertook to destroy the walls of the old mill and to fill up the pit at the bottom where the sluiceway is located. This is the only channel for the water from the lower part of the race, and if the sluiceway, channel, or pit is destroyed or filled up without another way being provided plaintiffs will suffer additional injury.

15. Plaintiffs have been and are willing to remove the obstruction in the mill race and keep it open but defendants have prevented them from doing so.

## Discussion

The mill race in question was constructed so as to slope towards either end. The bottom of the race at the west gate near the present location of the Rodgers' house was lower than the bottom of the race at the other end, at the wheel pit, but this does not determine the question as to whether water coming from the ravine or gully flowed north or south. If the high point of the race was north of the ravine it is, of course, manifest that the natural course of the water flowing down the ravine would be towards the south. On the other hand, if the high point was south of the ravine or gully, the natural course of the water would be towards the north. There is nothing to show the precise location of the high point although some of defendants' witnesses estimated it to be about four feet from the wheel or from the mill. Some of defendants' witnesses testified that since the destruction of the mill in 1910 the course of the water flowing down the ravine was towards the north, but the testimony of the plaintiffs and others living in close proximity to the ravine, who should best know, was that the

course of such water was towards the south until the storm of 1928. We could discover nothing in the appearance, manner, or demeanor of these witnesses that would reflect upon their credibility and accordingly we have found as a fact that the general course of the water in the mill race has been from north to south. This leaves for determination the legal question as to plaintiffs' right to have the water's course down the race into the wheel pit, through the sluiceway, and into Harvey's Creek kept open. Such course has existed for half a century. If it is obstructed, plaintiffs will suffer serious damage as the result of the flooding of their properties.

In Taggart v. Jaffrey, 75 N. H. 473, 475-76, 76 Atl. 123, 125, the court said:

"The rule is universal that riparian rights may be acquired along the artificial channel of a natural stream. Upon any of the grounds suggested, this plaintiff could maintain his position. There was a dedication. The stream had been changed in a manner to indicate that the alteration was permanent. There are prescriptive rights. It ran in this way for more than twice the period necessary to the presumption of a grant before the plaintiff purchased his tract of land. There is an estoppel. He relied upon the apparently permanent conditions when he made his purchase; and since that time, and acting upon conditions as they were, he has openly made the improvements which he says are now interfered with. That he has the rights of a riparian proprietor upon a natural watercourse cannot be open to serious question."

In Smith et al. v. Youmans et al., 96 Wis. 103, 109, 70 N. W. 1115, 1117, cited in Taggart v. Jaffrey, supra, the law is declared to be:

"The watercourse, though artificial, may have originated under such circumstances as to give rise to all the rights that riparian proprietors have in a natural and permanent stream, or have been so long used as to become a natural watercourse prescriptively."

In Kray v. Muggli et al., 84 Minn. 90, 96, 86 N. W. 882, the doctrine is stated as follows:

"Where the flow of a stream of water has been diverted from its natural channel, or obstructed by a permanent dam, and such diversion or obstruction has continued for the time necessary to establish a prescriptive right perpetually to maintain the same, the riparian owners along such stream of water, who have improved their property with reference to the change and in reliance on the continuance thereof, acquire a reciprocal right to have the artificial conditions remain undisturbed."

### Conclusions of law

1. The defendants have no lawful right to obstruct the flow of water in the mill race or divert the same from its usual course through the bed of the mill race and the underground sluiceway to the creek, which has been its course since the erection of the mill.

2. Defendants should be restrained from interfering with plaintiffs, their agents, workmen, laborers, or servants in the removal of the obstruction consisting of stone and gravel in the mill race and from placing or maintaining any obstruction in said mill race or in the channel stream leading into the race, and from causing the water of said stream to encroach upon and wash away plaintiffs' lands, or in any way closing the natural channel and outlet of the stream or diverting the same to plaintiffs' injury and damage.

3. Defendants should pay the costs.

### Decree nisi

On consideration of the foregoing case it is ordered, adjudged and decreed as follows:

1. That the defendants, Elmer Freeman and Beulah Freeman, his wife, their agents, workmen, laborers, and servants be restrained (a) from interfering with the plaintiffs, viz., Hiram W. Long, Lizzie Long, Fred A. Long, Edna P. Long, Stephen Rodgers and Edna Rodgers, their agents, workmen, laborers, or servants in removing the obstruction consisting of a pile of stones and gravel in the mill race leading to the abandoned Bergen and Cable mill in the village of West Nanticoke, Plymouth Township, Luzerne County; (b) from placing or maintaining any further obstructions in the mill race or in the channel of the stream leading into said mill race, and (c) from closing the natural channel and outlet of said stream down said mill race through the old waterway under said mill and into Harvey's Creek.

2. That the defendants pay the costs.

From Frank P. Slattery, Wilkes-Barre, Pa.